**MILLER INDUSTRIES, INC., Joe N. Hendrix Co.; Old Feller, Inc., J & G, Inc., Plaintiffs,**

v.

**CATERPILLAR TRACTOR CO. and Burford Equipment Co., Defendants,**

**John N. Magoteaux, Intervenor.**

**Civ. A. No. 78–70–H.**

United States District Court, S. D. Alabama, S. D.

July 11, 1979.

Douglas M. Fryer, Seattle, Wash., A. Clay Rankin, III, J. Hodge Alves, III, Mobile, Ala., for plaintiffs and intervenor.

James W. Garrett, Jr., and Robert A. Huffaker, Montgomery, Ala., for Burford Equipment Co.

William H. Hardie, Jr., Mobile, Ala., for Caterpiller Tractor Co.

HAND, District Judge.

This is an admiralty action in which the plaintiffs seek to recover for defects in the construction of the engine in the fishing vessel PRISCILLA ANN, constructed by defendant Caterpillar Tractor Company, and sold to the plaintiffs by defendant Burford Equipment Company. Suit was originally filed in the United States District Court for the Western District of Washington and is in this Court by virtue of a transfer under Title 28, U.S.C.A., § 1404(a). The plaintiffs contend that the damages suffered by the plaintiffs resulted from negligence and poor workmanship on the part of the defendants, for breach of warranty on part of the defendants and, alternatively, that the defendants were strictly liable for the alleged defects in the engine. The matter came on for trial before the Court and the Court, having considered the record, the testimony and exhibits adduced at trial, and the memoranda of law and arguments propounded by counsel, together with the applicable law, finds as follows:

## FINDINGS OF FACT

1. Plaintiffs Miller Industries, Inc., Joe N. Hendrix Company, Old Feller, Inc., and J & G, Inc., are each corporations organized and existing under the laws of the State of

Washington, with each having its principal place of business in the State of Washington. Each of the corporate plaintiffs are partners in a partnership known as Hi-Sea Fisheries, and at all times relevant to this lawsuit the partnership owned and operated the F/V PRISCILLA ANN.

2. The defendant Caterpillar Tractor Company is a corporation organized under the laws of the State of Delaware with its principal place of business being Peoria, Illinois. Defendant Burford Equipment Company is a corporation organized under the laws of the State of Alabama with its principal place of business being in Montgomery, Alabama.

3. On or about April 21, 1975, Francis L. Miller entered into a contract with Bender Welding and Machine Company, Inc., for the construction of a 127 foot vessel to be named the F/V PRISCILLA ANN. The partnership intended to utilize the vessel to engage in the king crab fishing off the coast of Alaska in the Bering Sea and surrounding waters. This contract was subsequently assigned to the partnership by Miller.

4. Defendant Caterpillar is engaged in the business of designing and manufacturing marine diesel engines and, in fact, did design, manufacture, and sell the Caterpillar D–399 marine engine, serial number 91B822, that was subsequently installed in the F/V PRISCILLA ANN.

5. Defendant Burford is the authorized Caterpillar distributor and repair facility in Mobile, Alabama. On August 7, 1975, Burford purchased the engine in question from Caterpillar. On September 25, 1975, Burford sold the engine to Bender Welding and Machine Company, which later installed the engine in the F/V PRISCILLA ANN.

6. On January 13, 1976, Caterpillar sent a service letter to a number of their dealers, including Burford, making specific reference to this particular engine by serial number. The letter concerned a soft sun gear in this particular engine, and the evidence is clear that Burford did not test or replace the sun gear in the engine in accordance with the Caterpillar letter prior to the sailing of the vessel from Mobile.

7. On February 6, 1976, Caterpillar mailed a service letter to its dealers concerning a piston wrist pin problem and referring to specific engines, including the engine that was installed aboard the F/V PRISCILLA ANN. Burford received this letter but did not replace the piston wrist pins in the engine.

8. The sun gear and wrist pins in the engine installed in the F/V PRISCILLA ANN were in the same condition at installation as when they left the Caterpillar factory.

9. At the time of the manufacture of the engine in question, it contained a fuel pump, part number 2S7264. On or before October 1, 1976, after the vessel had been in operation, a valve lifter nut lossened, and the fuel injection pump on the number 15 cylinder jammed the lower part of the valve lifter rack, which caused noise in the engine and incorrect metering of fuel with attendant excessive carbon build-up in the piston.

10. On August 29, 1976, Burford performed a sea trial on the Caterpillar D–399 engine aboard the F/V PRISCILLA ANN. However, Burford did not advise any representative of the plaintiffs or any representative of Bender Welding and Machine Company with respect to any problem related to the sun gear, valve lifter, nuts, or fuel pump of the engine. On September 10, 1976, the F/V PRISCILLA ANN, with Francis Miller as captain, was delivered to the plaintiffs by Bender and departed Mobile for the Panama Canal.

11. At approximately 5:00 p. m. on September 12, 1976, while in or near the Yucatan Straits the F/V PRISCILLA ANN encountered vibration problems in the main engine. Captain Miller radioed the problem to Bender, which in turn reported the difficulty to Burford. Captain Miller was advised by Burford by radio to continue at a slower pace on to the Panama Canal. Following these instructions, Captain Miller reduced his speed from 11 to 6 knots and the F/V PRISCILLA ANN arrived at the Panama Canal at 1:00 a. m. on September 17, 1976 one and one-half days behind schedule.

12. The vibration problem was caused by the soft sun gear. Miller reported the problem to Cardozo and Lindo, S. A., Caterpillar's authorized dealer in Panama, and that firm commenced the performance of repairs. After the commencement of the repairs, Miller again radioed Bender in Mobile and complained that the repairs were not being performed properly and were being delayed. Bender passed this information along to Burford, which elected to fly two mechanics to the Panama Canal Zone to assist in the repairs.

13. During the course of the repairs to the sun gear a crack in the reduction gear housing was discovered. Burford recommended that a new gear housing be installed, and made arrangements to have a new one delivered to the Canal Zone by air freight. Subsequently, however, the mechanics welded the crack in the old housing instead of installing a new one.

14. Following the completion of the repairs in Panama, which were paid for by Caterpillar in accordance with its warranty, the F/V PRISCILLA ANN left the Canal Zone on September 25, 1976, bound for Seattle, Washington. The Court finds that as a proximate result of the combined negligence of Caterpillar and Burford in failing to correct the sun gear condition before the vessel departed Mobile, the F/V PRISCILLA ANN was delayed a day and a half in arriving in Panama, and in excess of eight full days undergoing repairs there.

15. On October 1, 1976, as the vessel made her way north along the Mexican coast, the loose valve lifter nut on the # 10 cylinder manifested itself, backed off, and caused an improper flow of fuel which required immediate attention. As a direct result of these conditions, the F/V PRISCILLA ANN was forced to divert into Acapulco for repairs by the authorized Caterpillar dealer in Mexico City.

16. Because of transportation problems from Mexico City and the failure of the Mexican Caterpillar dealer to bring the necessary parts for repair on the mechanics' initial trip to Acapulco, the repairs took considerably longer than expected. However, ultimately the Mexican Caterpillar dealer replaced the necessary parts to repair the damage done by the loosened nut, and the F/V PRISCILLA ANN departed Acapulco at 0915 October 6, 1976. The Court finds that the delay in Acapulco exceeded five days. This delay was due to the negligence of Burford Equipment Company in failing to torque the locking nuts properly in Mobile. The inordinately long repair time in Acapulco was proximately caused by Burford's negligence since it was not highly extraordinary under the circumstances to anticipate that it would occur.

17. At 5:00 p. m. on October 7, 1976, the F/V PRISCILLA ANN stopped at Bahia Tenaciata, Mexico, to repair a broken pipe in the main engine cooling system. The boat left Bahia Tenaciata at 8:00 a. m. the next day, after sitting out the passage of Hurricana Madeline.

18. The vessel passed customs on October 12, 1976 at San Diego, California, and reached Captain Miller's home in Westport, Washington, at 11:00 p. m. on October 16, 1976. The vessel finally reached Seattle at 5:00 p. m. on October 18.

19. After arriving in Seattle, Captain Miller contacted N. C. Marine, the authorized Caterpillar repair facility in Seattle, and complained about the failure of the engine prelube pump to operate properly, along with several other minor problems. N. C. Marine replaced the welded housing with a new housing, replaced the piston cooling jet-tube assemblies in accordance with a Caterpillar service letter dated August 31, 1976, and replaced the piston pins in accordance with the service letter of February 6, 1976.

20. In the absence of the necessity for major engine repairs to the wrist pins and reduction gear housing, the F/V PRISCILLA ANN would have remained no more than three days in Seattle to take on fuel, supplies and crab pots, and to complete minor engine repairs. However, the defective wrist pins and reduction gear housing problems resulted in an additional 14-day delay in Seattle while these repairs were accomplished. The Court finds that this

unanticipated delay was the direct and proximate result of the combined negligence of Caterpillar and Burford in failing to correct the sun gear and wrist pin problems before the vessel departed Mobile.

21. After departing Seattle on November 2, 1976, the vessel made the final portion of the voyage to the Bering Sea fishing grounds without further incident or unanticipated delay. The F/V PRISCILLA ANN began laying out crab pots at 1800 on November 15, 1976.

22. Considering the delays sustained by the F/V PRISCILLA ANN during the entire course of her voyage to Alaska, the Court finds that as a direct and proximate result of the combined negligence of Burford and Caterpillar in failing to correct the wrist pin and sun gear problems in Mobile, the F/V PRISCILLA ANN lost 22 days of fishing time during the most productive portion of the 1976 Alaska king crab season. In addition, as a direct and proximate result of the negligence of Burford in connection with the locking nut incident, the F/V PRISCILLA ANN sustained an additional five days' lost fishing time.

23. In seeking to establish the damage suffered from loss of use, the plaintiffs rely upon the catch achieved by other king crab vessels during the F/V PRISCILLA ANN's downtime from October 19, 1976 to November 15, 1976. The evidence revealed that the F/V AMERICAN STAR caught an average of 12,276.68 pounds of king crab per day during the period from October 22 to November 14. The F/V AMERICAN EAGLE averaged 18,169.60 pounds per day from October 22 to November 20. The F/V PROGRESS averaged 10,838.19 pounds per day from October 18 to November 18. During the latter part of November and the early part of December, when the F/V PRISCILLA ANN was averaging 7,955.63 pounds per day, the F/V AMERICAN STAR averaged 4,674.14 pounds, the F/V AMERICAN EAGLE averaged 8,052.77 pounds, and the F/V PROGRESS averaged 6,284.13 pounds, so that Court is content that reference to these vessels is appropriate. The average daily performance for all three of the other vessels during the F/V PRISCILLA ANN's downtime was 13,761.36 pounds.

24. By comparing the performance of the other three vessels during the downtime period with the performance of these vessels in relation to the performance of the F/V PRISCILLA ANN after the downtime period, the Court finds that the F/V PRISCILLA ANN was deprived of a catch worth $248,869.84 as a result of the downtime.

25. In calculating the damages sustained by the F/V PRISCILLA ANN, it is necessary to subtract from the lost gross catch of the vessel the expenses which plaintiffs did not have to incur because the vessel was not fishing. These included the cost of fuel, groceries and bait. After subtracting these figures, the Court finds that the average daily net lost catch of the F/V PRISCILLA ANN for the 27-day period was $8,508.82 per day. The total lost net catch of the F/V PRISCILLA ANN for the 27 days was therefore $229,738.14.

26. The Court accordingly finds that the combined negligence of Caterpillar and Burford in connection with the sun gear and wrist pin problems proximately resulted in damage to the plaintiffs in the form of lost catch in the amount of $187,194.04. In addition, the five days' downtime caused by Burford's negligence in connection with the locking nut proximately resulted in additional damage to the plaintiffs in the amount of $42,544.10.

27. Assessing the comparative fault of Caterpillar and Burford in connection with the damage caused by their concurring negligence, the Court finds that Burford should be responsible for 60% of the damages and Caterpillar 40%.

28. The plaintiffs have been paying a minimum of 10% per annum interest on borrowed money since December, 1976. This case does not present any peculiar or unusual circumstances which would prevent the award of pre-judgment interest on plaintiffs' aforestated damages. Accordingly, the Court finds that the plaintiff is entitled to pre-judgment interest at the rate of 10% per annum commencing (for

convenience of calculation) on January 1, 1977, several days after the conclusion of the 1976 king crab season.

29. Each of the four crewmen who worked aboard the F/V PRISCILLA ANN during 1976 were paid on a share basis of 8% of the gross catch of the vessel. They signed on as crewmen for the entire season, and were required to perform work in preparing the pots and fishing gear during the summer and early fall, and to serve as members of the delivery crew on the voyage from Mobile to Alaska. All work performed by the crew prior to commencement of fishing was performed without compensation other than their share of the catch of the vessel during the subsequent king crab season. Plaintiff has claimed the portion of the lost catch which would have been paid over to the crewmembers under the share arrangement as a trustee for the crewmembers. In addition, John Magoteaux, one of the crew, has intervened on his own behalf.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this lawsuit and the parties hereto by virtue of Title 28, U.S.C.A., § 1333, this being an action in admiralty.

2. The plaintiffs set forth three separate and distinct theories of recovery: warranty, negligence, and strict liability. The Court is content that the evidence in this matter supports a verdict for the plaintiff under each of these theories.

3. Under the negligence theory of liability in this case, the plaintiffs seek recovery under the rule set out in *MacPherson v. Buick Motor Company,* 217 N.Y. 382, 111 N.E. 1050 (1916). In *MacPherson,* Judge Cardozo stated that when an object of personalty is such that its use is reasonably certain to place life and limb in peril if negligently made, then the manufacturer of the personalty is under a duty to make the object carefully. The rule had been adopted by the *Second Restatement of Torts,* section 275 of which imposes liability upon a manufacturer who fails to exercise reasonable care in the manufacture of a chattel that, if not carefully made, may involve an unreasonable risk of causing physical harm. The *MacPherson* rule was first adopted for admiralty cases in *Sieracki v. Seas Shipping Company,* 149 F.2d 98 (3rd Cir. 1945), and the rule has been accepted by the Fifth Circuit in admiralty cases. *See Watz v. Zapata Off-Shore Company,* 431 F.2d 100 (5th Cir. 1970).

4. Turning to the specific facts of this case, the Court concludes that both defendants were guilty of negligence with respect to the manufacture and sale of the F/V PRISCILLA ANN's engine. Clearly, Caterpillar's manufacture was negligent to the extent that the engine was defective. And the fact that Caterpillar warned Burford of the defects does not lessen the breach of Caterpillar's duty to the plaintiffs. Similarly, defendant Burford was negligent in passing the defective engine on to Bender for installation without conducting appropriate tests to rule out the existence of such defects, and Burford was additionally negligent in failing or refusing to correct the defects after receiving notification from Caterpillar that some defects were present in the engine. Accordingly, the Court is of the opinion that each of the defendants are liable to the plaintiffs for their negligent acts in an amount that would fully compensate the plaintiffs for all damages actually and proximately resulting from the negligent acts of the defendants.

5. Caterpillar is not relieved of liability for negligence because of the fact that, by its service letters sent well in advance of the departure of the vessel, it notified Burford to perform corrective measures. Burford's failure to take corrective action was reasonably foreseeable to Caterpillar and could not be regarded as highly extraordinary under the circumstances. The intervening negligence of Burford was not a superseding cause of harm sufficient to relieve Caterpillar of liability. *Todd Shipyards Corporation v. Turbine Service, Inc.,* 467 F.Supp. 1257 (E.D.La. 1978); *Comstock v. General Motors Corporation,* 358 Mich. 163, 99 N.W.2d 627, 78 A.L.R.2d 449 (1959); *Cf., Pan-Alaska Fish-*

eries, Inc. v. Marine Construction and Design Co., 565 F.2d 1129 (9th Cir. 1977); Second Restatement of Torts, §§ 440–442, 447.

■ 6. The plaintiffs' second theory of liability is strict liability under section 402A of the Second Restatement of Torts, which imposes liability upon the seller of a product when the product is sold "in a defective condition unreasonably dangerous to the user or consumer or to his property". The rule applies both to the seller and to the manufacturer of a product, id. section 402A, comment f, and the liability is in tort and thus requires no privity of contract between the parties. Id., comment 1.

■ 7. This Court has previously considered the propriety of a strict liability claim in an admiralty action, and has concluded that such a claim is viable:

5. The doctrine of strict liability in tort has been expressly recognized as a part of the federal maritime law in at least four circuits. Pan-Alaska Fisheries, Inc. v. Marine Construction and Design Company, 565 F.2d 1129 (9th Cir. 1977); Lindsay v. McDonnell-Douglas Aircraft Corporation, 460 F.2d 631 (8th Cir. 1972); Schaeffer v. Michigan-Ohio Navigation Company, 416 F.2d 217 (6th Cir. 1969); McKee v. Brunswick Corporation, 354 F.2d 577 (7th Cir. 1965).

6. The Court acknowledges that the Fifth Circuit Court of Appeals has not yet ruled on this issue. But the overwhelming authority in other districts within this Circuit supports this holding. In re Alamo Chemical Transportation Company, 320 F.Supp. 631 (S.D.Tex. 1970); Solleau [Soileau] v. Nicklos Drilling Company, 302 F.Supp. 119 (W.D.La. 1969); Houston-New Orleans, Inc. v. Page Engineering Company, 353 F.Supp. 890 (E.D.La.1972).

Laurentine, Inc. v. General Motors Corporation, Civil Action No. 77–313–H (S.D.Ala., April 17, 1978).

■ 8. In the present case the evidence is clear that defendant Caterpillar manufactured and sold the engine in an unreasonably dangerous condition and that defendant Burford sold the engine in the same condition. The Court concludes that the engine was in an unreasonably dangerous condition since it contained a defect that could immobilize the vessel and result in the vessel being stranded on the high seas, thereby imperiling the lives of all those aboard. Under this state of the law and facts the Court concludes that each of these defendants is strictly liable to the plaintiffs for the damages suffered as a result of the defective condition of the engine.

9. The plaintiffs argue that they are entitled to recover damages for the downtime loss of use of the vessel—indeed, this is the only item of recovery sought. The Supreme Court of the United States has long recognized the propriety of recovery for loss of use, see e. g., The Conqueror, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937, 944 (1897); The Potomac, 105 U.S. 630, 26 L.Ed. 1194 (1882), and the rule has recently been enforced by the Fifth Circuit in Delta Marine Drilling Company v. M/V Baroid Ranger, 454 F.2d 128 (5th Cir. 1972). The only limitation that has been noted by the Fifth Circuit is that such damages must be established by sufficient proof, limiting recovery to those cases "where the loss can be proved with reasonable certainty." Id. at 130, citing, e. g., The Potomac, supra; Continental Oil Company v. S.S. Electra, 431 F.2d 391 (5th Cir. 1970); City of Miami v. Shipping & Trading Company, 232 F.2d 847 (5th Cir. 1956).

10. The defendants contest any right of the plaintiffs to recover for purely economic loss. In challenging the negligence and strict liability claims, the defendants assert that the law recognizes no right of recovery for purely economic or pecuniary loss.

11. On the negligence issue the defendants point to the traditional tort rule that where only pecuniary loss is involved no recovery should be allowed for mere negligence. See Prosser on Torts, § 101, at 665–667 (4th Ed.1971). While the Court acknowledges the validity of this rule, the rule has not been interpreted by any Court to apply to tortious conduct within the

realm of admiralty, and the law of admiralty incorporates only those matters of tort law that are not inconsistent with the law of admiralty. *Harrison v. Flota Mercante Grancolombiana,* 577 F.2d 968 (5th Cir. 1978). In *The Conqueror, supra,* the Supreme Court did not apply the traditional tort rule in a case in which the lost profits resulted from wrongful detention, and this Court is not persuaded that such recovery is precluded here.

12. With respect to the strict liability claim, the defendants contend that section 402A is not addressed to cases of mere pecuniary loss, but rather is limited to cases where there is "physical harm" or "property damage," citing *Fredonia Broadcasting Corporation v. RCA Corporation,* 481 F.2d 781 (5th Cir. 1973). In *Fredonia Broadcasting* the Fifth Circuit stated that "Fredonia suffered only economic loss, and the doctrine of strict liability is not applicable to such losses." *Id.* at 797. The defendants cite other cases from other jurisdictions holding that strict liability does not lie for mere pecuniary loss, *e. g., Southwest Forest Industries, Inc. v. Westinghouse Electric Corporation,* 422 F.2d 1013 (9th Cir. 1973); *Posttape Associates v. Eastman Kodak Company,* 537 F.2d 751 (3rd Cir. 1976), but none of the cited cases arose in admiralty. This Court cannot avoid the fact that strict liability has been recognized as a valid admiralty claim, and that lost profits are a recoverable element of damages in admiralty. On this basis, the Court is persuaded that the plaintiffs are entitled to recover damages for purely economic losses under a strict liability theory.

13. The only other theory of liability advanced by the plaintiffs was for breach of warranty. Under Alabama law, the plaintiffs clearly could not recover on a breach of warranty theory from Caterpillar or Burford for there is no privity of contract, as is required by *Ala.Code* § 7–2–318 in cases of purely economic loss. This Court finds the analogy compelling, and is of the opinion that the plaintiffs are entitled to no recovery from the defendants on the warranty claims.

14. In an admiralty case where the negligence of one or more defendants concurs to cause damage to the plaintiff, the court may apportion the liability to the negligent defendants in accordance with the comparative degree of their fault. *United States v. Reliable Transfer Company,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Leger v. Drilling Well Control, Inc.,* 592 F.2d 1246 (5th Cir. 1979). The Court has found that Burford's negligence represents a 60% share of the fault with respect to the damages resulting from the sun gear and wrist pin problems and Caterpillar's represents a 40% share, and the parties are liable in this proportion for such damages to the plaintiffs which resulted from their combined negligence.

15. Burford is solely liable for the results of its negligence in connection with the failure properly to torque the locking nut on the valve lifter and for the loss which resulted from this fault.

16. Plaintiffs have presented an alternative theory of strict liability under the General Maritime Law in reliance on *Pan-Alaska Fisheries, Inc. v. Marine Construction and Design Co., supra.* In light of the Court's findings that all three problems with this engine (sun gear, wrist pins, and loose locking nut) could be anticipated to cause a breakdown of the main propulsion engine of the F/V PRISCILLA ANN, each such problem constituted a "defect" which was "unreasonably dangerous to the user or consumer." Both defendants should accordingly be liable pursuant to this theory in the same proportion as their liability for negligence. Neither should be excused from liability because Caterpillar paid for repairing the physical damage to the engine under warranty. *Pan-Alaska Fisheries, Inc. v. Marine Construction and Design Co., supra; Todd Shipyards Corporation v. Turbine Service, Inc., supra; Laurentine, Inc. v. General Motors Corporation,* C.A.No. 77–313–H (S.D.Ala.1978).

17. Loss of profits in commercial fishing are recoverable in an action based upon negligence under the General Mari-

time Law. *Jones v. Bender Welding & Machine Works, Inc.,* 581 F.2d 1331 (9th Cir. 1978); *Todd Shipyards Corporation v. Turbine Service, Inc., supra; Berg v. General Motors Corporation,* 87 Wash.2d 584, 555 P.2d 818 (1976).

■ 18. Likewise, loss of profits are recoverable under the General Maritime Law of strict products liability under these circumstances. *Pan-Alaska Fisheries, Inc. v. Marine Construction and Design Co., supra; Lindsay v. McDonnell Aircraft Corp.,* 460 F.2d 631 (8th Cir. 1972); *Sheaffer v. Michigan-Ohio Nav. Co.,* 416 F.2d 217 (6th Cir. 1979); *McKee v. Brunswick Corporation,* 354 F.2d 577 (7th Cir. 1965).

■ 19. Damages for lost fishing profits must be proved to a reasonable certainty. However, once the fact that an economic loss has been sustained is proven, this standard does not preclude the Court from establishing the amount and value of the catch lost by the plaintiffs' vessel on the basis of such evidence as might be reasonably expected to be available under the circumstances. This includes a comparison to similar vessels engaged in the same fishery in the same general area as would have been fished by the plaintiff but for the fault of the defendants. *The Conqueror,* 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897); *The Reefer Queen Co. v. Marine Construction & Design Co.,* 73 Wash.2d 779, 440 P.2d 448, 1969 A.M.C. 677 (1968); *Cf., Daniels Towing Service, Inc. v. Nat Harrison Associates,* 432 F.2d 103 (5th Cir. 1970); *Restatement of Torts,* § 912. Plaintiffs have sustained the burden of proving net loss of use resulting from the negligence of Caterpillar and Burford in the amount of $187,194.04. Burford should be responsible for 60% of this figure, and Caterpillar for 40%. In addition, plaintiffs have borne the burden of establishing downtime as a result of Burford's negligence in connection with the locking nut in the amount of $42,544.10.

■ 20. Plaintiffs as shipowners are entitled to recover the non-intervening crew's share of this loss of use as trustee for said crew. *Carbone v. Ursich,* 209 F.2d 178 (9th Cir. 1953); *United States v. Laflin,* 24 F.2d 683 (9th Cir. 1928); *Reefer Queen Company v. Marine Construction and Design Company,* 73 Wash.2d 774, 440 P.2d 448 (1968).

■ 21. John Magoteaux, one of the crewmen of the vessel, had intervened in his own right, and is entitled to a judgment in the amount of 8% of plaintiffs' total damages against Caterpillar and Burford.

■ 22. The final issue is whether the plaintiffs are entitled to pre-judgment interest, which they have sought at a rate of 10% per annum from November 15, 1976 to the date of trial. The award of pre-judgment interest in an admiralty case is committed to this Court's discretion, *e. g., Harrison v. Flota Mercante Grancolombiana,* 577 F.2d 968 (5th Cir. 1978), and the Fifth Circuit has recently stated that such interest is to be awarded except where certain "peculiar circumstances" may justify refusal to grant such interest. *Dow Chemical Company v. M/V Gulf Seas,* 593 F.2d 613, 614 (5th Cir. 1979). In the instant case the Court finds no peculiar circumstances that would justify a denial of such interest; indeed, the Court is content that there need not have been a dispute as to liability that caused the plaintiffs to so long await recovery of their lost profits. Accordingly, the Court is of the opinion that the plaintiffs are entitled to recover of the defendants interest at the rate of 10% per annum from January 1, 1977 to date of payment of judgment.